UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

v.                                   Case No:  6:12-cv-932-Orl-28GJK

GURUDEO PERSAUD,

          Defendant.

_____

## ORDER

Defendant, Gurudeo "Buddy" Persaud, started an investment company in 2007 and solicited family members, friends, and acquaintances for investments with the company.  By guaranteeing rates of return, Mr. Persaud was able to acquire more than a million dollars in investments but did not disclose important details about his trading strategies or use of the funds.  As a result of his investing decisions and misappropriation of funds, nearly all of the money was lost.

In 2012, the Securities and Exchange Commission (SEC) filed this action against Mr. Persaud for violations of several securities statutes.  The case is before the Court on the SEC's Motion for Summary Judgment (Doc. 40), to which Mr. Persaud has not responded.  As to Counts I-IV of the Complaint, there are no genuine issues of material fact, and the SEC's motion for summary judgment must be granted.  There are, however, issues of fact with regard to Counts V and VI, and the motion for summary judgment must be denied as to these counts.

## I.   Background

Mr. Persaud was formerly employed as an independent registered representative at an investment firm called Money Concepts. (See Persaud Dep., Doc. 40-3, at 29, 35; see also Answer, Doc. 13, ¶ 15; Compl., Doc. 1, ¶ 15). While employed in that role, he started a side investment project called White Elephant, LLC. (Persaud Dep. at 35). To avoid the appearance of a conflict of interest, Mr. Persaud listed family members instead of himself as the managing members and registered agent of White Elephant on all documents filed with the state of Florida. (Id. at 27). He forged their names when he needed to make most transactions on behalf of White Elephant. (See, e.g., id. at 37-41). In doing so, he concealed his involvement with White Elephant from his employer. (See id. at 28-29).

Mr. Persaud solicited friends and family members to invest with White Elephant. (Id. at 42). In soliciting investors, Mr. Persaud guaranteed specific rates of return varying from six to eighteen percent annually. (Id. at 47-48). He told potential investors that he would only be paid from anything earned in excess of the specific rates of return he promised. (Id. at 52). Mr. Persaud admits that he knew particular rates of return should not be guaranteed for certain investments. (See id. at 50-51). He thought, however, that he could guarantee the investors' principal because he "always had [his] real estate to fall back on" and he "was pretty sure [he] could make [investors] money." (Id. at 45; accord id. at 50).

Through these actions, Mr. Persaud was able to procure more than a million dollars in investments. (Id. at 71). This money was pooled in a single White Elephant account. (Id. at 77). Mr. Persaud admits that he used up to $250,000 of investors' funds to pay his personal expenses; this use was not part of the original agreement he

2

had with investors.[1]  (Id. at 146-47).  Of the funds he did invest, he followed a system that gave him directional picks in the marketplace "based upon the gravitational pull of the [E]arth and the moon."  (Id. at 56).  He based between ninety and ninety-five percent of White Elephant's investments on this strategy.[2]  (Id. at 65).  He made no profits but instead lost money.  (Id. at 69-71).  This investment strategy, combined with Mr. Persaud's use of funds for personal expenses, yielded losses of around $950,000.  (See id. at 103).

Throughout this time, Mr. Persaud kept few written records of the money he received from investors.  (Id. at 89).  He continued to solicit investments from people knowing that White Elephant was losing money.[3]  When some clients asked him for their money back, he sometimes paid them from the pooled funds in the White Elephant account.  (Id. at 77).  He lied to some investors, explaining that the money he returned in excess of the initial investment was profit earned by White Elephant.  (Id. at 78).  In

---

[1]  The amount Mr. Persaud misappropriated is disputed. Karaz S. Zaki, an accountant with the SEC, states that based on review of the bank and brokerage account records, Mr. Persaud actually "transferred approximately $415,000 of investors' contributions from White Elephant's bank accounts to himself and his family members from July 2007 until January 2011."  (Zaki Decl., Doc. 40-5, ¶ 5(d)).

[2]  Mr. Persaud used a website called xyber9.com to make investment picks based on the gravitational pull of the Earth and the moon. (Persaud Dep. at 56). He also used Best Choice Software, which made investing picks based on seasonal patterns in stocks. (Id. at 66).  For the remainder of his trading decisions, Mr. Persaud used an online futures trading class and another service that made "live calls" to tell participants what to buy and sell based on "technical indicators." (Id. at 67-68). He stated, "I didn't believe [these services were] a hundred percent [guaranteed].  But I believed that they were nearly seventy to eighty percent [guaranteed]." (Id. at 68).

[3]  Mr. Persaud was already reimbursing investors with the money invested by others by 2009, (see Persaud Dep. at 87), but he continued soliciting potential investors through at least January 2010, (see Compl. ¶ 38; Answer ¶ 38; Abreu Decl., Doc. 40-4).

fact, White Elephant earned no profit.[4]   (See id. at 79-80).   On some occasions, Mr. Persaud paid investors back with his own personal funds.   (Id. at 85).

As a result of White Elephant's losses of nearly one million dollars, individual investors suffered losses. For example, Ms. Doreen Abreu declares that she invested $175,000 she received under the terms of the policy insuring her late husband's life and was promised a return of six percent.   (Abreu Decl., Doc. 40-4, ¶¶ 5-6; see also Answer ¶ 38; Compl. ¶ 38).   She has repeatedly asked Mr. Persaud for her money back and was told that he lost her money; she is still owed $166,000 in principal alone.   (Abreu Decl. ¶ 10).   Ms. Abreu states that she was not informed about Mr. Persaud's system of investment or his method for repayment and that she would not have invested with him had she known these facts.   (Id. ¶ 12).

## II.   Discussion

### A.   Summary Judgment Standards

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of demonstrating that no genuine issues of material fact remain.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). That burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

---

[4] A review of White Elephant's accounts showed that Mr. Persaud used "investors' contributions to pay approximately $225,000 to investors from November 2007 until January 2011."   (Zaki Decl. ¶ 5(d)).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, and it may not weigh evidence or determine credibility.   Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."   Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  A "district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." United States v. 5800 S.W. 74th Ave., 363 F.3d 1099, 1101 (11th Cir. 2004).

## B.    Registration Violation Claims

In Count I, the SEC claims that Mr. Persaud violated Sections 5(a) and 5(c) of the Securities Act of 1933[5] by selling unregistered securities.   (Compl. ¶¶ 69-71). Section 5(a) provides that it is unlawful for any person "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell [a] security" or "to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, [a] security for the purpose of sale or for delivery after sale" if the security does not have an effective registration statement.   15 U.S.C. § 77e(a).   Section 5(c) makes it unlawful "to make use of any

_____

[5] Registration requirements in Section 5 of the Securities Act of 1933 can be found at 15 U.S.C. § 77e.

means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security." Id. § 77e(c).

> 1.   *Applicability of Exemptions*

Section 5 does not apply to securities or transactions exempt under sections 3 and 4.   See id. §§ 77c & 77d.   These exemptions may be raised as affirmative defenses, but because Mr. Persaud has failed to do so, it cannot be concluded that any exemptions apply.   See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953) ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable."); see also Swenson v. Engelstad, 626 F.2d 421, 425 (5th Cir. 1980) ("The so-called private offering exemption is an affirmative defense which must be raised and proved by the defendant.").[6]

> 2.   *Application*

"In order to establish a prima facie case for a violation of § 5 of the Securities Act, the SEC must demonstrate that (1) the defendant  directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect."   SEC v. Calvo, 378 F.3d 1211, 1214 (11th Cir. 2004); see also Raiford v. Buslease, Inc., 825 F.2d 351, 354 (11th Cir. 1987) (stating that the use of the facilities of interstate commerce must be "in connection with the sale or offer").

---

[6] The private offering exemption is one of the many exemptions in these two sections of the Securities Act.

The first question is whether what Mr. Persaud sold is considered a "security." The definition of "security" under securities laws is broad, "sufficient to encompass virtually any instrument that might be sold as an investment." SEC v. Edwards, 540 U.S. 389, 393 (2004) (quotation omitted). The Securities Act defines "security" to include an "investment contract."[7]  15 U.S.C. § 77b(a)(1). The meaning of the term "investment contract" is not clarified in the Securities Act. See SEC v. W.J. Howey Co., 328 U.S. 293, 298 (1946). Notably, the concept of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id. at 299. Schemes that promise fixed rates of return can be investment contracts. Edwards, 540 U.S. at 397. "'The Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests.'" SEC v. Merch. Capital, LLC, 483 F.3d 747, 754-55 (11th Cir. 2007) (quoting Williamson v. Tucker, 645 F.2d 404, 418 (5th Cir. 1981)).  Under Supreme Court and Eleventh Circuit precedent, an investment contract has "four components: (1) an investment of money, (2) a common enterprise, (3) the expectation of profits, and (4) the expectation of profits to be derived solely from the efforts of others." SEC v. ETS Payphones, Inc., 408 F.3d 727, 731-32 (11th Cir. 2005) (per curiam); accord Howey, 328 U.S. at 298-99.

Here, it is undisputed that individuals gave money to Mr. Persaud for investment in White Elephant. (See Persaud Dep. at 44; see also Account Registration Forms, Doc.

_____

[7] The Securities Exchange Act of 1934 also includes within the definition of security an "investment contract." 15 U.S.C. § 78c(a)(10). Because Congress used the same words, the Court will construe an investment contract security to have the same meaning under both statutes.

40-7).  A common enterprise can be shown by the "broad vertical commonality" test, which requires a showing "that the investors are dependent upon the expertise or efforts of the investment promoter for their returns."  ETS Payphones, Inc., 408 F.3d at 732 (quotations omitted).  He made all of the decisions regarding individuals' investments; additionally, Mr. Persaud had to use money from other "investors to meet [his] obligation to existing investors," as in ETS Payphones.  See 408 F.3d at 732 (quotation omitted). In other words, "[i]nvestors were dependent upon [Mr. Persaud]'s ability to attract new business to realize profits."  Id. Though he failed to actually deliver returns, investors were still dependent on him for the returns he promised them. The SEC has thus shown a common enterprise.

Mr. Persaud admits that in conducting the affairs of White Elephant, he promised fixed rates of return. (Persaud Dep. at 47; see also Account Registration Forms, Doc. 40-7). This constitutes an expectation of profits under the third component of the test. ETS Payphones, Inc., 408 F.3d at 732; see also Edwards, 540 U.S. at 397.  Regarding the fourth factor, that the expectation of profits must be derived solely from others' efforts, "[t]he more control investors retain, the less likely it becomes that the contract qualifies as a security."  ETS Payphones, Inc., 408 F.3d at 732.  Once individuals invested their money with Mr. Persaud, they relinquished control over it—Mr. Persaud had possession of the funds and made all of the investing decisions.   Occasionally investors requested some of their money back, but they were paid in small amounts— not from their own funds but from the common pool of funds. Thus, the SEC has shown that the four elements of an investment contract are present and that the investments in White Elephant are considered securities.

To demonstrate that Mr. Persaud *sold* securities, the SEC must establish that he was a "necessary participant" or "substantial factor" in the sale; it need not prove scienter. <u>Calvo</u>, 378 F.3d at 1215.  Here, Mr. Persaud takes sole responsibility for the sale of the securities and denies involvement of any other individuals. (Persaud Dep. at 38 ("I did everything [in White Elephant]."); <u>see also</u> Answer ¶ 14; Compl. ¶ 14). As the sole seller, Mr. Persaud certainly was a necessary participant in the sale.  The SEC has established that Mr. Persaud sold securities and has thus satisfied the first prong of the prima facie case for a violation of Section 5.

Regarding the second prong, Mr. Persaud admits that he "used interstate commerce, transportation, communication and the mails."  (Answer ¶ 13).   Under the third prong, Mr. Persaud admits that "White Elephant never registered an offering or class of securities under the Securities Act or the Exchange Act, and was never registered with the Commission in any capacity."  (Compl. ¶ 10; Answer ¶ 10).   Thus, the undisputed facts show that the SEC has met its burden of proving that Mr. Persaud violated Sections 5(a) and 5(c) of the Securities Act.

C.   **Antifraud Claims**

The SEC also alleges violations of a number of securities antifraud provisions in Counts II through VI, specifically violations of Section 17 of the Securities Act of 1933,[8] Section 10(b) of the Securities Exchange Act of 1934,[9] and Section 206 of the Investment Advisers Act of 1940.[10]  (Compl. ¶¶ 72-88).  Generally, to prove antifraud claims the SEC must show that the defendant committed a material misrepresentation

---

[8] Section 17 of the Securities Act is found at 15 U.S.C. § 77q.

[9] Section 10 of the Securities Exchange Act is found at 15 U.S.C. § 78j.

[10] Section 206 of the Investment Advisers Act is found at 15 U.S.C. § 80b-6.

or omission, that the defendant did so in the offer or sale of securities (or in connection with the sale of securities), and that the defendant acted either with scienter or negligence.   The elements the SEC must prove are mostly the same under Section 10(b) and Section 17, see SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999), with some exceptions.[11]

### 1. *Material Misrepresentation or Omission*

Proof of violations under the anti-fraud provisions of the securities statutes requires "material misrepresentations or materially misleading omissions."   Merch. Capital, 483 F.3d at 766 (discussing both Section 17(a) and Section 10(b)). To prove materiality, the SEC must show "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). The test is the same for a misrepresentation. See Merch. Capital, 483 F.3d at 766 ("The test for materiality in the securities fraud context is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." (quotation omitted)).   A defendant's guarantee of a specific rate of return can be considered materially misleading.  Id. at 766-67.

The SEC alleges, and Mr. Persaud admits, that Mr. Persaud made several different kinds of misrepresentations or omissions.   Specifically, he failed to disclose

---

[11] Notably, the SEC does not need to show scienter under Section 17(a)(2) or (a)(3). Monarch Funding Corp., 192 F.3d at 308.   Additionally, Section 17(a) applies to any offer of securities as well as any sale of securities, 15 U.S.C. § 77q(a), while Section 10(b) applies only to the purchase or sale of any security, 15 U.S.C. § 78j(b).

that his trading strategy was based on lunar cycles,[12] misrepresented the risks associated with the investment,[13] made false promises of guaranteed rates of return,[14] misrepresented the source of returns,[15] sent investors letters stating a false verification of funds,[16] and misrepresented his compensation to investors[17] as well as how he would use investors' funds.[18]

---

[12] (Pl.'s Mot. Summ. J., Doc. 40, ¶¶ 38-44). Mr. Persaud testifies that he made trading decisions according to a program that gave trading picks "based upon the gravitational pull of the [E]arth and the moon," (Persaud Dep. at 56), and did not tell investors of his strategy, (id. at 63).

[13] (Pl.'s Mot. Summ. J. ¶¶ 45-51). Mr. Persaud also testifies that he promised investors that their principal contributions would be secure, (Persaud Dep. at 45), even though his trading resulted in net losses starting in the first month he received investor funds, (Answer ¶ 41; Compl. ¶ 41).

[14] (Pl.'s Mot. Summ. J. ¶¶ 52-70). Mr. Persaud admits that he promised investors they would be paid between a 6% and 18% return annually and that he made these promises while he was misappropriating money for his personal expenses and after he had started trading for net losses. (Answer ¶¶ 39-41; Compl. ¶¶ 39-41).

[15] (Pl.'s Mot. Summ. J. ¶¶ 71-73). Mr. Persaud concedes that he hid investor losses and told investors that money they received from him was trading profits when in reality it was money from other investors' contributions. (Answer ¶¶ 51 & 52; Compl. ¶¶ 51 & 52).

[16] (Pl.'s Mot. Summ. J. ¶¶ 74-83). Mr. Persaud agrees that he sent investors false account balances that showed trading profits when in fact only losses existed. (Answer ¶¶ 53 & 55; Compl. ¶¶ 53 & 55).

[17] (Pl.'s Mot. Summ. J. ¶¶ 84-91). Mr. Persaud admits that he told investors his compensation would be trading profits in excess of the guaranteed returns, (Persaud Dep. at 44), but he instead used investors' principal contributions to compensate himself, (Answer ¶ 61; Compl. ¶ 61). Mr. Persaud misappropriated funds from July 2007 until at least January 2011, (Answer ¶¶ 61-62; Compl. ¶¶ 61-62), though he continued to offer and sell securities until at least January 2010, (Answer ¶ 14; Compl. ¶ 14).

[18] (Pl.'s Mot. Summ. J. ¶¶ 92-96). Mr. Persaud also admits that he told investors their money would be invested "in the stock, futures, and real estate markets, and in notes," (Compl. ¶ 64; Answer ¶ 64), but he actually used investor contributions to pay for his personal expenses, (Answer ¶ 67; Compl. ¶ 67).

There is a substantial likelihood that a reasonable investor would find that Mr. Persaud's disclosure of his true trading strategies, the use of the investment funds, and the risk of the investment would significantly alter the total mix of information made available.  Mr. Persaud's misrepresentations and omissions were material.

      2.   *In Connection With*

To succeed under Section 10(b), the SEC must prove that the misrepresentation was "in connection with" the purchase or sale of a security.[19] 15 U.S.C. § 78j(b).  The Eleventh Circuit has found that this requirement means that the misrepresentation must be "concerning the securities . . . sold."  Saxe v. E.F. Hutton & Co., 789 F.2d 105, 108 (11th Cir. 1986).  This requirement has been given a broad interpretation by courts; "[i]t is enough that the scheme to defraud and the sale of securities coincide."  SEC v. Zandford, 535 U.S. 813, 822 (2002).

The SEC has proven that the misrepresentations and omissions made by Mr. Persaud were in connection with the sale of securities under Section 10(b) and in the offer or sale of any securities under Section 17(a).  Mr. Persaud made misrepresentations or omissions about guaranteed rates of return, the risk of the investment, the use of the investment money, and his trading strategy while soliciting individuals for investments.  At the very least, the scheme to defraud and the sale of securities coincided as contemplated in Zandford.

---

[19] Section 17 does not use the term "in connection with."  Instead, under Section 17 the SEC must prove that the action occurred "in the offer or sale of any securities."  15 U.S.C. § 77q(a).  This Court views the Section 17 connection requirement as being equivalent to that of Section 10(b).

3.   *The Offer or Sale of Securities*

As discussed above, Mr. Persaud's activities involved investment contracts, which constitute securities under the securities statutes.  He takes sole responsibility for offering and selling White Elephant securities.  Thus, the SEC has shown that Mr. Persaud was involved in both the offer and the sale of securities.

4.   *Scienter*

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).   The same standard of scienter is required to prove a violation of Sections 17(a)(1), 10(b), and 206(1).   See Messer v. E.F. Hutton & Co., 847 F.2d 673, 677-78 (11th Cir. 1988) ("Both [Section 17(a)(1) of the Securities Act and Section 206(1) of the Investment Advisers Act] have been interpreted by binding precedent as requiring the same proof of *scienter* as is required to establish a violation of Section 10(b) and Rule 10b-5 of the securities laws."). The standard for scienter is met in the Eleventh Circuit when the plaintiff shows that the defendant acted with at least "'severe recklessness.'"  Merch. Capital, 483 F.3d at 772  (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999)). In addition,

> "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989) (quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc)). Mere "unreasonableness does not meet the standard for scienter." Id. at 815.

13

Here, Mr. Persaud neglected to tell investors that he was misappropriating funds for his own personal use, that he was basing his trading decisions on lunar cycles, or that he was using investors' funds to pay back other investors.   Mr. Persaud also guaranteed specific rates of return despite knowing from his work at another investment firm that rates often could not be guaranteed.   He continued this behavior for several years, even after it became clear that his investments were losing money.   These actions constitute an "extreme departure from the standards of ordinary care," and the danger of misleading buyers from these actions was "so obvious" that Mr. Persaud must have known about it.   Mr. Persaud acted with scienter.

5.    *Section 17(a) of the Securities Act*

In Count II, the SEC alleges a violation of § 17(a)(1) of the Securities Act. (Compl. ¶¶ 72-74).   Section 17(a)(1) makes it unlawful for a person "in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce" or through the mail "to employ any device, scheme, or artifice to defraud."   15 U.S.C. § 77q(a)(1).   "To show a violation of section 17(a)(1), the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter."   Merch. Capital, 483 F.3d at 766.

In Count III, the SEC alleges a violation of §§ 17(a)(2) and 17(a)(3).   (Compl. ¶¶ 75-77). Sections 17(a)(2) and (3) provide that it is unlawful for a person "in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce" or through the mail:

> (2) to obtain money or property by means of any untrue statement of a
> material fact or any omission to state a material fact necessary in order to

make the statements made, in light of the circumstances under which they
were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which
operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(2)-(3).  To prove a violation of section 17(a)(2) or (a)(3), the SEC

must show the same elements as for Section 17(a)(1) with the exception that the SEC

need only prove negligence, not scienter.  Merch. Capital, 483 F.3d at 766.

As discussed above, in both the offering and selling of securities, Mr. Persaud

made misrepresentations and misleading omissions that were material, and he made

them with scienter.  Because the SEC has established the elements of a Section 17(a)

violation, summary judgment will be granted for the SEC on Counts II and III.

6.    *Section 10(b) and Rule 10b-5 of the Securities Exchange Act*

In Count IV, the SEC alleges a violation of Section 10(b) of the Securities

Exchange Act and Rule 10b-5 promulgated thereunder. (Compl. ¶¶ 78-80).  Section

10(b) of the Securities Exchange Act makes it

unlawful for any person, directly or indirectly, by the use of any means or
instrumentality of interstate commerce or of the mails . . . [t]o use or
employ, in connection with the purchase or sale of any security registered
on a national securities exchange or any security not so registered . . . any
manipulative or deceptive device or contrivance in contravention of such
rules and regulations as the Commission may prescribe . . . .

15 U.S.C. § 78j(b). Rule 10b-5 implements Section 10(b) and "forbids the use, 'in

connection with the purchase or sale of any security,' of 'any device, scheme, or artifice

to defraud,' or any other 'act, practice, or course of business' that 'operates . . . as a

fraud or deceit.'"  Zandford, 535 U.S. at 819 (quoting 17 C.F.R. § 240.10b-5 (2000)).

Rule 10b-5 further prohibits making, in connection with the purchase or sale of a

security, "any untrue statement of a material fact or [omitting] to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The scope of coverage of Rule 10b-5 "is coextensive with the coverage of § 10(b)." Zandford, 535 U.S. at 816 n.1.

In passing Section 10(b), "Congress sought 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" Id. at 819 (quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972)). For this reason, the statute should be construed "'flexibly to effectuate its remedial purposes.'" Id. (quoting Affiliated Ute Citizens, 406 U.S. at 151). "To prove a 10(b) violation, the SEC must show (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." Merch. Capital, 483 F.3d at 766.

As stated above, the SEC has shown that Mr. Persaud made misrepresentations and misleading omissions that were material and that these actions were done in connection with the sale of securities with scienter. Thus, the SEC has met its burden under Section 10(b) and Rule 10b-5, and the Court must grant summary judgment to the SEC as to Count IV.

7.    *The Investment Advisers Act*

The SEC alleges violations of §§ 206(1) and 206(2) of the Investment Advisers Act in Count V. (Compl. ¶¶ 81-84). Section 206(1) and (2) provides that it is unlawful

> for any investment adviser, by use of the mails or any means or
> instrumentality of interstate commerce, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud any client or
> prospective client;
> (2) to engage in any transaction, practice, or course of business which
> operates as a fraud or deceit upon any client or prospective client . . . .

15 U.S.C. § 80b-6(1), (2).   In Count VI, the SEC alleges violations of § 206(4) and Rule 206(4)-8 of the Investment Advisers Act.   (Compl. ¶¶ 85-88). Section 206(4) provides that investment advisors cannot "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" and also states that the SEC can promulgate rules and regulations to prevent acts that are "fraudulent, deceptive, or manipulative."   Id. § 80b-6(4). The SEC has promulgated a rule stating that it would be "fraudulent, deceptive, or manipulative . . . for any investment adviser to a pooled investment vehicle" to make material, untrue statements or omissions or otherwise engage in fraudulent conduct.   17 C.F.R. § 275.206(4)-8(a).

An investment adviser under the Investment Advisers Act is defined as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). However, the statute excludes from that definition "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."[20]   Id. § 80b-2(a)(11)(C).   The Investment Advisers Act refers to the Securities Exchange Act for the definition of both broker and dealer.[21]   Id. § 80b-2(a)(3), (a)(7).   A broker is "any person engaged in the business of effecting transactions in securities for the account of others."[22]   Id. § 78c(a)(4).   A dealer is "any person engaged in the business of buying

---

[20] The statute contains other exclusions as well, but they are inapplicable here.

[21] The one exception is that the term "dealer" under the Investment Advisers Act "does not include an insurance company or investment company." 15 U.S.C. § 80b-2(a)(7).

[22] The definition of "broker" contains an exception for certain bank activities that is not applicable here. 15 U.S.C. § 78c(a)(4)(B).

and selling securities . . . for such person's own account through a broker or otherwise."[23] 15 U.S.C. § 78c(a)(5). Finally, Rule 206(4)-8 defines "pooled investment vehicle" but does not modify the definition of investment adviser.     17 C.F.R. § 275.206(4)-8(b).

Neither party adequately addresses whether Mr. Persaud fits within the definition of an investment adviser or whether he should be considered a broker or dealer and thus excluded from the definition of an investment adviser.[24]     Issues of material fact remain as to whether Mr. Persaud is covered by the Investment Advisers Act. The SEC has failed to meet its burden, so its motion for summary judgment on Counts V and VI must be denied.

### D.     Relief

To remedy Mr. Persaud's violations of securities laws, the SEC requests a permanent injunction, disgorgement and prejudgment interest, and a civil penalty. (Pl.'s Mot. Summ. J. at 31-34). For the permanent injunction, the SEC asks the Court to enjoin Mr. Persaud from violating the sections of the securities acts under which it has sued. (Compl. at 17). "The SEC is entitled to injunctive relief when it establishes (1) a

---

[23] The definition of "dealer" contains some exceptions, but they are not applicable here. 15 U.S.C. § 78c(a)(5).

[24] The SEC states only that Mr. Persaud admitted he was an investment adviser.  (Pl.'s Mot. Summ. J. at 31, 3).   For this proposition, however, the SEC cites only the Complaint and Answer at Paragraph 86, where Mr. Persaud admitted that he "acted as an investment advisor to White Elephant." The legal definition of "investment adviser" could be different from the colloquial meaning, however, and this admission does not answer whether Mr. Persaud fits within the precise statutory definition of an investment adviser.  In fact, elsewhere in the Complaint and Answer, Mr. Persaud denied that he acted as an investment adviser within the meaning of the Investment Advisers Act. (Answer ¶ 82; Compl. ¶ 82). The SEC does not offer evidence to answer the question of whether Mr. Persaud was in the business of advising others as to the value of securities or the advisability of investing in securities.   It also does not address whether Mr. Persaud fits within the broker or dealer exception of the statute.

prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." Calvo, 378 F.3d at 1216.   Mr. Persaud "agrees to entry of the permanent injunction."   Joint Pretrial Stipulation, Doc. 47, at 3. Thus, the Court will enter a permanent injunction with respect to Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Securities Exchange Act.   The SEC shall submit a proposed injunction specifying the terms it requests. Because the SEC has not established a prima facie case of a violation of the Investment Advisers Act by its proof submitted in support of summary judgment, the Court withholds judgment on the appropriateness of an injunction under that statute, pending resolution on the merits.

There remain issues of material fact regarding disgorgement and a civil penalty. The SEC contends that the Court should order disgorgement in the amount of $1,070,000, plus prejudgment interest. (Pl.'s Mot. Summ. J. at 34).   Mr. Persaud admits that he raised more than a million dollars in investments, (Persaud Dep. at 71), but the specific amount of investments he procured has not been established by the SEC, (see Zaki Decl. ¶ 5(a) ("[I]nvestors deposited approximately $1,070,000." (emphasis added))).   Mr. Persaud contends that he paid some investors back with personal funds, and the SEC has not addressed whether any personal reimbursement by Mr. Persaud or restitution ordered by the court in Mr. Persaud's criminal case should be taken into consideration in ordering disgorgement.   Further, the SEC concedes that the amount it is entitled to in the form of prejudgment interest and a civil penalty has yet to be determined. (Pl.'s Mot. Summ. J. at 34).   Finally, if the SEC is able to prove that Mr. Persaud violated the Investment Advisers Act, the amount Mr. Persaud can or should

be required to pay may change.  The Court thus withholds judgment as to the SEC's entitlement to disgorgement and prejudgment interest.

## III.   Conclusion

The SEC has met its burden of showing that Mr. Persaud violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933; Section 10(b) of the Securities Exchange Act of 1934; and Securities Exchange Act Rule 10b-5.  However, genuine issues of material fact exist as to whether Mr. Persaud can be found liable under the Investment Advisers Act.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.  The SEC's Motion for Summary Judgment (Doc. 40) is **GRANTED IN PART** as and **DENIED IN PART**. The Motion is granted as to counts I-IV and denied as to Counts V and VI.

2.  The SEC shall submit a proposed injunction on or before Monday, December 30, 2013.

**DONE** and **ORDERED** in Orlando, Florida on December 10, 2013.

JOHN ANTOON II
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties